# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JAMES SEIBEL,

    Plaintiff,

  v.                                            Case No. 19-CV-643

ANDREW M. SAUL,
**Commissioner of Social Security,**

    Defendant.

## DECISION AND ORDER

James Seibel seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying his claim for a period of disability and disability insurance benefits under the Social Security Act, 42 U.S.C. § 405(g). For the reasons below, the Commissioner's decision is reversed and the case is remanded for further proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four.

## BACKGROUND

Seibel filed an application for a period of disability and disability insurance benefits alleging disability beginning on May 15, 2015 due to Parkinson's disease, anxiety, depression, arthritis, and back/shoulder pain. (Tr. 209.) Seibel's application was denied initially and upon reconsideration. (Tr. 15.) Seibel filed a request for a hearing and a hearing was held before an Administrative Law Judge ("ALJ") on January 12, 2018. (Tr. 30–89.) Seibel testified at the hearing, as did Lee Knutson, a vocational expert. (*Id.* at 30.)

In a written decision issued May 24, 2018, the ALJ found that Seibel had the severe impairments of Parkinson's disease and left shoulder impingement. (Tr. 17.) The ALJ further

found that Seibel did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "listings"). (Tr. 18–19.) The ALJ found Seibel had the residual functional capacity ("RFC") to perform light work but with the following limitations: frequently reach overhead with the upper extremities; frequently handle and finger with the left upper extremity; never climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs; never work at unprotected heights or around moving mechanical parts; and cannot work in an environment that would result in exposure to extreme cold. (Tr. 19.)

The ALJ found Seibel was capable of performing his past relevant work as a plant manager, both as the job is generally performed and as Seibel actually performed it. (Tr. 23–24.) As such, the ALJ found that Seibel was not disabled from his application date through March 31, 2017, his date last insured. (Tr. 24.) The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Seibel's request for review. (Tr. 1–5.)

## DISCUSSION

### 1. *Applicable Legal Standards*

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is not conclusive evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (internal quotation and citation omitted). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions

2

drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

### 2. *Application to this Case*

Seibel argues the ALJ erred by failing to properly consider how his work-related stress impacted his Parkinson's disease, failing to properly evaluate the limitations related to his psychotic disorder that arose secondary to his Parkinson's disease, and employing the incorrect legal standard when evaluating Seibel's statements regarding his symptoms. (Pl.'s Br. at 2, Docket # 12.) I will address each argument in turn.

#### 2.1 Consideration of Work-Related Stress

##### 2.1.1 Medical Background

Seibel began experiencing intermittent left arm tremors in early 2014, while he was still working as a plant manager. (Tr. 302.) Seibel treated with Nurse Practitioner Kristine Twomey in June 2014. (*Id.*) Upon physical examination, Twomey noted that Seibel exhibited a very mild and very intermittent left upper extremity resting tremor and a slight slowness of movement, known as bradykinesia. (Tr. 303.) Twomey concluded that there were no definite

symptoms to suggest Parkinson's disease and instructed Seibel to follow up in six months. (*Id.*) In December 2014, Seibel reported to Twomey that his tremor was slightly worse and while it was bothersome, it was not functionally limiting. (Tr. 297.) Thus, Twomey did not recommend medication and advised Seibel to remain very physically active. (*Id.*)

In May 2015, Seibel contacted Twomey's office to report that his tremor was much worse and that stress and extremes in temperature, particularly cold, worsened the tremor. (Tr. 395.) Seibel saw his family practice physician, Dr. Deborah Ihde, on May 12, 2015. (Tr. 464.) Seibel asked Dr. Ihde to provide him with a letter requesting retirement because of his "likely diagnosis of Parkinson's." (*Id.*) Dr. Idhe noted that while Seibel had not yet started medication, he was contemplating starting because his tremor was becoming more troublesome. (*Id.*) Dr. Idhe stated that Seibel "is hoping that retirement and lowering his stress level will allow him to be more functional longer. A letter is done today for him in this regard." (*Id.*) Dr. Idhe's letter, dated May 12, 2015, states as follows:

> Due to progressing medical conditions, Jim is seeking retirement. I do feel that spending more time focusing on his health will be beneficial for him and his condition. He has a Parkinson's tremor and with facing a progressive condition it is advisable to lower as much stress in his environment as he is able.

(Tr. 382.) Seibel again saw Twomey in June 2015, at which time he stated that he wanted to try medication. (Tr. 395.) Upon physical examination, Twomey noted that Seibel's face was slightly masked and he had a more continuous left upper extremity resting tremor. (*Id.*) Twomey concluded that as Seibel's tremor and other symptoms had worsened over the past year, she believed he had idiopathic Parkinson's disease. (Tr. 396.) Seibel was prescribed amantadine and encouraged to remain physically active. (*Id.*) Despite his Parkinson's diagnosis, Seibel's treating physical therapist noted in July 2015 that Seibel had "really no limitations in his functional activity level." (Tr. 392.)

In August 2015, Seibel reported to Dr. Ihde that the amantadine made him feel dizzy and unfocused (Tr. 411, 455.) He stated that he was managing and was not sure he wanted to try further treatment. (Tr. 455.) Seibel saw Dr. Yasaman Kianirad in September 2015, seeking a second opinion. (Tr. 411.) Dr. Kianirad observed a mild resting tremor and slight bradykinesia of the left upper extremity. (Tr. 413.) Dr. Kianirad concluded that Seibel "most likely had idiopathic Parkinson's disease but given developing confusion in early stage of PD." (Tr. 414.) Seibel was prescribed Azilect. (*Id.*)

Seibel underwent a consultative examination with Dr. Michael Madden in October 2015. (Tr. 500.) Seibel stated that while his Parkinson's symptoms slowly worsened over the previous year, he believed that his capabilities had not changed much except for some issues with his left hand and left leg. (Tr. 501.) Seibel stated that he could still grasp and manipulate objects, despite it being more difficult with his left hand; could walk without much issue, except his left foot would occasionally drag; and had no difficulty standing in one spot for a period of time. (*Id.*) Dr. Madden observed a continuous resting pill rolling macro tremor of the left arm and hand. (Tr. 502.)

In December 2015, Seibel sought an additional opinion from Dr. Tanya Simuni. (Tr. 513.) Dr. Simuni observed Seibel had a mildly masked face and a resting tremor of the left hand while walking. (Tr. 515.) Dr. Simuni also concluded that Seibel had idiopathic Parkinson's disease and noted that Seibel reported modest benefit with Azilect and an ability to maintain his activities of daily living. (Tr. 516.) After this initial visit, Dr. Simuni completed a Parkinson's disease medical source statement on January 26, 2016 in which she noted that stress affected Seibel's tremors (Tr. 507) and opined that Seibel was incapable of even a low stress job because "stress in general regardless of level is bad for his symptoms" (Tr. 510).

In April 2016, Seibel reported to Dr. Kianirad that the tremor did not interfere with his daily activities (Tr. 631) and she observed a mild to moderate resting tremor in the left upper extremity and slight bradykinesia of the left upper extremity (Tr. 633). Dr. Simuni reported similar observations in July 2016. (Tr. 836–39.) Throughout the remainder of 2016 and 2017, Seibel's medical records continued to show only a mild intermittent left upper extremity resting tremor and minimal bradykinesia. (Tr. 842, 866, 880, 884.) By October 2016, Seibel's treating nurse, Carolyn Taylor, CPN, noted there was "[c]lear objective improvement" of his Parkinson's disease on Sinemet (Tr. 843) and by February 2017, Taylor noted that Seibel had only "minor functional disability" (Tr. 867, 881, 884).

### 2.1.2 Analysis

Seibel's case is a difficult one. There is no doubt that he has been diagnosed with Parkinson's, a progressive disease. However, during the relevant time period, Seibel was in the early stages of Parkinson's (Tr. 504) and the medical records consistently indicated that Seibel's tremor was mild and did not significantly interfere with his daily activities. Indeed, his treating nurse stated on multiple occasions that Seibel had "clear objective improvement" on Sinemet and that he had only minor functional disability. (Tr. 867, 881, 884.) Seibel concedes that he has "relatively good physical functioning" (Pl.'s Reply Br. at 1, Docket # 16) and testified that his medication controlled his tremors (Tr. 50). However, Seibel argues that this is only the case because he is not working. Seibel testified that if he went back to work, he did not know "if [the tremors] would come back or not." (*Id.*)

Herein lies the crux of Seibel's argument for remand. While the ALJ acknowledged that Seibel stated his tremor worsens when he is under stress or exposed to extreme temperatures (Tr. 20), the ALJ does not specifically analyze Seibel's claim that work stress

6

increases his tremor. This is somewhat strange because the ALJ does include a limitation in the RFC to work environments that would not result in exposure to extreme cold. (Tr. 23.) The ALJ states that this limitation is due to Parkinson's disease. (*Id.*) Thus, it is unclear why the ALJ credited one of Seibel's alleged triggers for his tremors and ignored the other.

Seibel cites to several cases in which the court found an ALJ erred by not considering how work stress effected claimants with cardiac impairments. *See, e.g.*, *Mulvenna v. Sullivan*, 796 F. Supp. 325, 334–36 (N.D. Ill. 1992); *Mitchell v. Sullivan*, 925 F.2d 247, 249–50 (8th Cir. 1991). While I agree this is an apt analogy, the cited cases presented a somewhat different situation than Seibel's. For example, in *Mitchell*, the claimant's physician specifically stated that he could not perform any job that required physical or mental stress, 925 F.2d at 250, and in *Mulvenna*, the claimant's treating physician specifically opined that based on the fact he knew the claimant "quite well," he felt the claimant was "at an increased risk of suffering a cardiac event in the future if he is required to return to work," 796 F. Supp. at 334. In contrast, Seibel's treating physician, Dr. Ihde, very vaguely stated that Seibel should spend more time focusing on his health and that "it is advisable to lower as much stress in his environment as he is able." (Tr. 382.) While it seems generally accepted that stress can aggravate tremors in people with Parkinson's disease,[1] nothing in Dr. Ihde's opinion appears specific to Seibel. Nor does she specify that Seibel should decrease work stress as opposed to stress in general. Dr. Ihde's "opinion," to the extent it is accepted as such, seems to be merely good advice to anyone suffering from Parkinson's disease.

This brings us to Dr. Simuni, who also opined that Seibel was incapable of even low stress jobs simply because "stress in general" is bad for Parkinson's symptoms. (Tr. 510.) The

---

[1] https://www.apdaparkinson.org/article/stress-anxiety-parkinsons-disease (last visited Apr. 8, 2020).

ALJ rejected Dr. Simuni's opinion on the grounds that she had only a brief doctor/patient relationship with Seibel prior to rendering her opinion and that her opinion was inconsistent with the record evidence. (Tr. 23.) The ALJ is correct on both fronts. Dr. Simuni's opinion is indeed suspect. Not only did Dr. Simuni render this opinion after treating Seibel only once, but her opinion as a whole is vastly inconsistent with not only the records from that visit, but with the medical evidence as a whole. Again, the record indicates Seibel was in the early stages of Parkinson's disease and he had relatively good functioning. There is absolutely no record support for the extreme limitations Dr. Simuni opines.

Despite the fact that it is questionable whether Seibel is entitled to disability benefits given the record, the case still requires remand because the record does support Seibel's claim that while he was working, the stress intensified his tremors. He testified that his left hand would shake so badly that he could not hold a pen or hold his telephone. (Tr. 45–46, 218.) Seibel reported to Twomey that stress was worsening his tremor, precipitating his May 2015 retirement. (Tr. 395.) Considering that the ALJ acknowledges Seibel's statements regarding stress and extreme temperature (especially cold) exacerbating his tremor (Tr. 20) and credits the statement regarding cold with a corresponding limitation in the RFC (Tr. 23), the ALJ's silence as to how stress affects his tremor prevents me from following his reasoning. Did he reject the statements about stress? And if so, why? If not, the ALJ should have also included a limitation in the RFC to low-stress work. Had the ALJ not committed this oversight (assuming jobs do exist with this additional limitation), Seibel's case would likely have been affirmed.

And while Seibel does not raise this issue, the ALJ should also reconsider his finding that Seibel can perform his past relevant work as a plant manager as he actually performed it.

(Tr. 23.) Again, the ALJ found that Seibel cannot work in an environment that would result in exposure to extreme cold. (Tr. 19.) Seibel testified that his plant did not have heat and he was exposed to the "ice cold" during the course of his employment. (Tr. 58, 70, 78, 218.) Perhaps the ALJ simply found that Seibel's plant was not cold enough to be "extreme," but this is not clear from the evidence and the ALJ made no finding on alternative jobs he could perform. (Tr. 23–24.)

    2.2    Consideration of Psychotic Disorder

Although Seibel's case is being remanded on other grounds, I will speak briefly on Seibel's remaining arguments to provide guidance to both the ALJ and the parties on remand. Seibel argues the ALJ erred by failing to consider his psychotic disorder. (Pl.'s Br. at 20–23.) Seibel sought sporadic mental health treatment throughout the relevant time period. As early as October 2014, Seibel reported engaging in catastrophic thinking, specifically regarding issues with his wife. (Tr. 318.) In August 2015, a physician's assistant speculated that "it could be possible" that his delusional/paranoid thoughts were "a manifestation of neuropsych disorder before the PD motor symptoms manifested themselves." (Tr. 452.) While Seibel continued to experience "delusional jealousy" throughout the relevant time period, the symptoms improved somewhat with medication (Tr. 610–11, 821) and his insight and judgment were stable enough to consider the possibility that his thoughts about his wife were delusional (Tr. 856). Further, his treating nurse questioned whether his delusional feelings were actually "normal or more in the realm of paranoia/delusions." (Tr. 843.)

While Seibel points to testimony that the delusional thinking interfered with his ability to keep up with his work (Tr. 62), he does not otherwise specify what limitations the psychotic disorder caused that the ALJ failed to include in the RFC. Further, the ALJ did consider the

9

fact that Seibel received counseling and took medication for his delusional thinking but found that the evidence indicated the delusional thoughts were controlled by medication. (Tr. 23.) I am not convinced that addressing the delusional thinking in the context of anxiety and depression and not as an independent psychotic disorder (*id.*) affected the outcome. However, because at least one treating provider, Dr. Michael Schrift, indicated that Seibel had a "psychotic disorder due to Parkinson's disease" (Tr. 610), the ALJ should consider whether Seibel's alleged psychotic disorder from Parkinson's disease warrants additional limitations.

### 2.3 Incorrect Legal Standard

Finally, Seibel argues the ALJ applied the incorrect legal standard in addressing his claims of disabling symptoms. It is worth noting that as a result of a line of cases from the Northern District of Illinois following *Minger v. Berryhill*, 307 F. Supp. 3d 865 (N.D. Ill. 2018), this same argument has been made frequently over the past year. However, while *Minger* attacks a new template, the argument itself is not new. In *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), the Seventh Circuit addressed the following template that was frequently found in ALJ's decisions:

> [A]fter considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments would reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

The *Parker* court noted that this is "meaningless boilerplate" because if something is "not *entirely* credible," it is unclear what weight the trier of fact gave to the evidence. *Id.* (emphasis in original). Perhaps because of the *Parker* court's criticism, the SSA tweaked its template. In *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012), the court addressed the new offending template, which reads as follows:

10

> [A]fter considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments would reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible to the extent they are inconsistent with the above RFC assessment.

The *Bjornson* court said that this template was even worse than the previous template, particularly because "the assessment of a claimant's ability to work will often (and in the present case) depend heavily on the credibility of her statements concerning the 'intensity, persistence and limiting effects' of her symptoms, but the passage implies that ability to work is determined first and is then used to determine the claimant's credibility." *Id.* The Seventh Circuit admonished the SSA to "take a close look at the utility and intelligibility of its 'templates.'" *Id.* at 646.

However, the Seventh Circuit did not state that use of a template, in and of itself, is cause for remand. If that were the case, few Social Security cases would be upheld. The problem is not the boilerplate itself. The problem is when boilerplate "'fails to inform us in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that claimant's complaints were not credible.'" *Id.* at 645 (citing *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004)). Thus, if the ALJ provided "sufficient reasons, grounded in evidence in the record, to support her ultimate determination" despite the boilerplate, *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014) (citing *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013)), remand is not required.

In March 2016, a new Social Security Ruling went into effect regarding the evaluation of symptoms in disability claims. SSR 16-3p. This Ruling superseded SSR 96-7p and the Administration made clear it was eliminating the use of the term "credibility" from its sub-regulatory policy. *Id.* The Administration stated that the evaluation of a claimant's symptoms

is based on the extent that the symptoms are consistent with the objective medical and other evidence in the record. *Id.* After SSR 16-3p went into effect, a new template began cropping up in the ALJ's decisions and is found in Seibel's case:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms. However, the claimant's statements concerning the intensity, persistent and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(Tr. 20.) What this new template does, in effect, is replace "not entirely credible" with "not entirely consistent" to echo the Administration admonition to eliminate the use of the term "credibility."

In *Minger*, the district court cited this current template as another example of the "meaningless boilerplate" so often criticized by the Seventh Circuit. However, it went a step further. The *Minger* court found that the template "doesn't even match what the Commissioner's own regulations say the standard for evaluating allegations about symptoms is: that the ALJ must determine whether those allegations 'can reasonably be accepted as consistent with the objective medical evidence and other evidence.'" 307 F. Supp. 3d at 871 (quoting 20 C.F.R. § 416.929(a)). The court found that this boilerplate actually created a different, more rigorous standard than required by the regulation, namely, that "allegations be 'entirely consistent' with the medical and other evidence." *Id.* Other courts in this circuit have followed suit. *See, e.g.*, *Whyte v. Saul*, No. 18-CV-1274, 2019 WL 5541412, *5 (E.D. Wis. Oct. 25, 2019); *Justin H. v. Berryhill*, No. 2:18CV383, 2019 WL 2417423, at *13 (N.D. Ind. June 7, 2019).

I am not convinced, however, that use of this boilerplate means the ALJ believes a claimant's statements must be entirely consistent with everything in the record in order to be

12

accepted. It seems more likely this is the same "meaningless boilerplate" ALJs have used for years with "not entirely consistent" substituted for "not entirely credible" in an attempt to conform with SSR 16-3p. Plus, SSR 16-3p does task the ALJ with determining the level of consistency between the claimant's statements and the objective medical and other evidence. SSR 16-3p (noting, for example, that when evaluating the statements from non-medical sources, "The adjudicator will consider any personal observations of the individual in terms of how consistent those observations are with the individual's statements about his or her symptoms as well as with all of the evidence in the file"). While this template clearly raises the same issue the Seventh Circuit raised in *Parker* (i.e., exactly how consistent is not entirely consistent?), this does not mean it is creating a more rigorous standard.

To the extent *Minger* stands for the proposition that this template, in and of itself, requires remand, I disagree. While Seibel states that he is "not challenging the use of boilerplate as such," (Pl.'s Br. at 25), he does not explain how this resulted in an erroneous decision beyond simply criticizing use of the boilerplate. Plaintiffs would do better to forgo challenging the boilerplate and instead focus on what the ALJ actually does in the decision.

## CONCLUSION

I find that the ALJ erred in failing to consider how work stress impacts Seibel's tremors due to Parkinson's disease. For this reason, the Commissioner's decision is reversed and the case is remanded for further proceedings.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the Commissioner's decision is **REVERSED**, and the case is **REMANDED** for further proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 8th day of April, 2020.

BY THE COURT

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge